We have restructured the courthouse room that's not really in the courthouse and we'll move on to the next case, case number 23-60316 Papin v. Univ of MS Med Ctr and we'll begin maybe I'm mispronouncing Papin, but we'll begin with Chad Flores. May it please the court, when the University of Mississippi Medical Center terminated the residency of Dr. Papin, it egregiously violated its contractual obligations and totally destroyed a medical career that he had spent his entire life building. What the district court should have done was recognize that this case deserved a trial, that Dr. Papin won that trial on every major ground he needed to win, and entered a judgment awarding him every dollar of damages that the jury gave him and more, but instead the district court got cold feet and zeroed him out with a matter of all rulings that cannot be sustained on appeal. We realize the case comes to the court with a long list of issues. Let me give the court the three critical issues that are keystone issues. These are keystone issues not just because we care about them, but because if you rule for us, other issues go away. Keystone issue number one is liability on the remediation agreement. Keystone issue number two is the actual damages question of lost income and then punitive damages. So we have liability on the remediation agreement, actual damages for lost income, and punitive damages. Let me explain why those are threshold issues and then get into the weeds. The reason that we go big on the remediation agreement is because both liability theories in this case give rise to the same damages. We have two alternative contract claims. The remediation agreement is the one that we prevailed on at trial, so the disposition we want there is an order that reverses and renders a judgment as to liability. This verdict is solid. The liability part of the case can be done if the court does that. You don't have to touch the alternative arguments we have about liability under the house officer contract. So that's threshold issue number one. On damages, we have an argument about the lost income damages. I know my friends on the other side disagree about whether we found an error, but on the remedy, on the remedy for that, the parties are in agreement. If the district court did err in capping us at one year of damages, the parties agree the remedy is a new trial on all actual damages. And so in that case, you don't have to touch the emotional distress damages issue. If you agree with us that we were entitled to something beyond one year, then the disposition is that you reverse and render a judgment. And what's your best case for that standpoint? Because your client was there for the year. I understand that it was planning to have five years, well aware, but the deal was one year. So why is that something you can claim the five years and not just the five years, but the lifetime for? So we've got three cases. The best Mississippi case is Aetna. Aetna is the case that tells you the rule in Mississippi is the nationwide rule, that you recover all damages that are reasonably foreseeable. That's Restatement 351. And it is true that in some cases, the only thing that is foreseeable is the term of the contract, but not in stepping stone jobs, right? There are a variety of industries where a job is more than just the salary. The job this year is access to a stream. The other cases we have, Your Honor, are Rice and Redgrave. One's a doctor case, one's an actor case. And this job is backed both by those legal precedents and a ton of proof explaining that for this particular industry, for a residency, the job is more than just the salary you get that year. If you terminate the residency, you take away his access to that career path. And so those are the precedents we have on our side. This court hasn't confronted the exact... How many... You know, maybe that's somewhere in the record and I missed it. How many situations does this arise? How many people come to the place for their time that's supposed to be five years and end up there only one year for whatever reason? How frequent is that? Or how much is it that everybody does their five years on their way to being a full-time doctor? Your Honor, I don't know that we have a percentage for you. We know that it's extremely rare for someone to not complete the course. So once you are on course, the norm is that doctors go all the way through the residency. And that would have been the norm here. We have both testimony from experts and the people with boots on the ground. And everybody says that but for this firing, this plaintiff would have gone all the way through. He was an excellent doctor, meeting all of his marks. And so we wouldn't say that we're entitled as a matter of law to actual damages that go far, far, far, far, far out in the future. I don't know what the outer bound is, but the court doesn't have to decide that here. The district court said one year and one year only. And that cap just cannot be erected. We are at least entitled to the remaining salary for the rest of his residency and indeed something beyond that. I don't know how far beyond that, but something beyond that. On the threshold liability question, I'm assuming there are thousands, maybe tens of thousands of medical residents around the country. And some are absent, some substance abuse, they must get disciplined. Do you have any case law that suggests when a program director is trying to keep them and remediate probation suspension that that becomes their new employment contract or it modifies the employment contract? In other words, it binds the state institution despite whatever laws there are about state contracting. No, Your Honor. We don't understand there to be a categorical law of remediation agreements in these contexts. The question is always what does this agreement say? It is true that most of these remediation situations involve a plan and not a contract. Often the employer will say, you haven't been producing to X level, we need you to produce to X level, and this is how we think you can do that. That's not this case. This case involves a very different situation where there is an agreement. The parties say, we have a dispute about how things went in the past. We agree to have a clean slate and we're going to change both sides' obligations. This is a critical part of the record. Dr. Earle, his testimony was unequivocal. He didn't have the power to terminate, right? So when he comes up with this, whatever we want to call it, performance improvement plan, academic plan, would you say it was a modification of the employment agreement with the medical center? No, Your Honor. The theory is two separate contracts. Two separate? The theory of the case is that for the, if you imagine the duration of the residency, we have the house officer contract that was the background sort of rules of the road for all five years. And then for this particular 60-day period, we had an extra agreement. Because when the parties executed the house officer contract. But an agreement with whom? With the hospital. So the deal is, you will work for 60 days and the terms are different now. These are not the house officer contract terms. These are the one, two, three, and four. But am I wrong to read Mississippi law that says when you're going to bind a public institution, these are the people that have to sign it. And otherwise you're at risk. This is the, I will mispronounce it, the Weeble People's Bank case law. Correct. We don't dispute that we need to comply with their rules for who can bind. We say we did. Those rules are set forth in the faculty and staff handbook. That's a document that is signed by the vice chancellor. And the handbook says that person can give signature authority to their designee. So this is a delegation theory of yours? It is, Your Honor. And where is the best trial record evidence that there was delegated authority to bind the public institution as distinct from program authority? Sure. So that's 6706 and 6730. These are in the briefs already. This is the faculty and staff handbook. This is the handbook that explains two critical things. One is that the person, the vice chancellor, this is the person who's on the board, can delegate their authority to sign these contracts. And that same document says that the program director, that's Dr. Earle, is in charge of signing remediation agreements. I don't understand my friends to disagree that this is a delegable authority. Well, is the handbook a contract? Yes, it is integrated into the house officer contract. That's right. So we have the contract and then the sort of key handbooks and staff manuals are part of the contract, Your Honor. Well, you did say it delegates authority to hire and to remediate, but you didn't say authority to terminate. Correct, Your Honor. We're not suing. So there's no dispute that UMMC is responsible for the termination. The question is who changed the deal for the 60-day period? Who gave him this extra contractual agreement, the clean slate agreement? So we're not debating who's responsible for firing. I think they'll agree, UMMC fired him, right? It doesn't matter who. The question is, did Earle have authority to make that agreement? The law gives them one leg up. The law says we can't rely on apparent authority. We have to find actual authority, and that's fine. We don't disagree. But then when it comes to proving actual authority, Mississippi law doesn't change the rules of the road. You can, if you want, go chapter and verse and find every single document along the way like you might prove some title dispute, or this is restatement law, this is the Board of Trustees case, or you can use a witness and ask them, was authority delegated? Or you can find circumstantial evidence, say, did this person have actual authority? So just focusing on the witness testimony, because I thought it was pretty much a consensus. Whitlock, Stewart, even Earle himself saying, medical students are in a dual status capacity. They are learning, they're students, and in that context we try to help them along. But they're separately employees, and if they risk the safety of patients, they're going to get fired. So I guess what I'm asking is, where is the witness testimony saying, no, all that testimony that I remember reading about dual status is in fact a singular thing, and what happened here was an agreement to modify the House office contract. So there's a lot there. So we have testimony directly on the question of whether Earle has authority to execute a remediation agreement, and it's from him. Yes. And I'm not disputing that. Of course the program director would have to have authority to improve the academics or whatever. So our position is that we don't have to dispute the dual sort of nature of these to win our point. The question is, what can Earle do? Can in that capacity, can he change the rules of the game for the 60 day period? And you say yes. Yes. That's the litany of testimony we have that is specific to this agreement. I think that there is some appeal. So what can Earle do? Can he change the employment contract? We say it's a new contract, but can he enter into this agreement, the remediation agreement? And bind the medical center. Correct. I think there could be hypotheticals where Dr. Earle was doing an agreement with residents that had nothing to do with this job, and we would say, oh, he can't bind UMMC then. If he wants to sell them a car, he's not buying UMMC. But he's in the zone of remediation. This is a process that is codified. So that's how you harmonize the coach situation and the copiers? Correct. There, finish the sentence, there, the people who purported to bind couldn't bind? Correct. But this is different because? Because the policies give Earle authority to control remediation, the process. That's the critical distinction there. I think if we flip this to another scenario, like a corporate scenario, it would be an easy case. We would say, of course, a corporate board has authority to control the company. But we know that companies delegate their authority all over the place. You can either find all the papers or just put a witness on the stand. This really? Okay. I'm sorry. I'm not trying to make you not finish, but you're starting to run out of time, and I want to ask, let's just assume, arguendo, we end up disagreeing with you on the remediation agreement. And so that takes us back to this house officer contract issue where you had an evidentiary issue that you said would have made a difference to the jury, and that was this malfeasance, inefficiency, or contumacious conduct. What the heck does that mean, which the jury asked? But the other side says, well, it doesn't matter if you didn't fire anyone else for the exact same thing. That makes no difference. What is your response to that? Our response is that the excluded evidence mattered for two relevant purposes, not the one they're trying to lead you to. This is not a case of disparate treatment. We are not arguing that it matters how he was treated versus that he was worse or better. We're arguing that the evidence showed you what the contract meant. Nobody knows what contumacious conduct means, and so we can look to the circumstances around the time of the contract and say, what did this company think it meant? You can find out what they think contumacious conduct meant by looking at who they fired for it and who they didn't. So it tells you what the contract meant. Well, what if you, MMC, said, oh, we had a lot of contumacious people. We just fired this one guy. What would you do with that? I mean, would that change what the jury needed to be told? But yes, so that tells that they were lying in our case, right? We had articulated reasons for why they fired Dr. Papin, and we wanted to find out, are they true or are they not? They said, we're firing you for misconduct X, and we said, let us show the jury evidence that when they cared about misconduct X, they actually investigated. They didn't investigate us for X. They just said it, right? And that kind of evidence goes critically to show, were they telling the truth about why are they fired or here? We don't care if it's better or worse. So that's the reason for the evidence is to kind of go against their testimony to show that, wait a minute, that's not what you're doing. Correct. Now, if they get up and say, well, we just do whatever we feel like it, then I guess that would be a different thing to consider. These arguments come up in the employment cases about pretext, right? And in those cases, it's more complicated because people are arguing about relative treatment. We're not arguing about relative treatment, just what happened to this plaintiff in this case. Okay. And then I do have a question on the punitives. What's your best case from Mississippi that an explicit contract is, you breach it and then can get, I'm just talking about against anybody, punitive damages. What's your best case on that? So we don't have a case that puts everything together. I've got one best case about immunity and one best case about punitives. I don't think UMSC disputes that we can get punitive damages on a breach of contract action, right? I don't think they dispute that. They talk about immunity, but- Well, I guess I'll ask them. I kind of was reading that they were saying that. Sure. So there's a case called- Please tell me. I don't think they're disputing it, which is why we haven't given it. There's a CASCIO, C-A-S-C-I-O, this is a Mississippi Supreme Court case, 327, South 3rd, 59, CASCIO. CASCIO is a case where a breach of contract action gives rise to punitive damages because of malice. Okay. So your point is if you've shown that it is a contractual violation that's not tortuous, you could get that. Correct. And you're not disputing that. You can prove an independent tort. If you prove a contractual violation that is also fraud, that gets you across the line. If you prove a contractual obligation that is breached because of gross negligence, that also gets you across the line. So that's where we get a lot of cases that talk about an independent tort. But malice, the state of mind, not an independent tort, will cross the threshold in a breach of contract action. That's what we have here. Okay. All right. Thank you. You've saved time for Beau. All right. And we have Paul Watkins on behalf of UMMC. I'm Paul Watkins for the University of Mississippi Medical Center. Our starting point is very easy, Your Honors. Dr. Papin had one contract with the Medical Center. Can you talk up a little? Yes, Your Honor. Dr. Papin had one contract with the Medical Center. It was his house officer contract. It defined the terms of his employment. It said how long the term was. It said how much he was going to be compensated. Critically, in this case, it was signed by the Vice Chancellor for Health Affairs, who is expressly authorized by IHL policy and by Medical Center policy to sign agreements on behalf of the institution. It was also signed by the Associate Dean for Graduate Medical Education, in this case. Was not signed by Dr. Earl. The testimony in the record is that program directors don't have any authority to negotiate the terms of house officer contracts, figure out what they're going to say, or to execute them. Now, Dr. Papin argued to the jury that the Medical Center breached his house officer contract when it terminated his employment in 2017. And the jury did not accept that argument. That question went to the jury. Well, but he said there was some evidence he wanted to put on and wasn't allowed to. And that was the question I was asking towards the end. So, why doesn't it matter what they do with other people in trying to understand? I mean, I'm not sure the average person knows what consummation conduct is. I'm not even sure all lawyers are very good at understanding what consummation conduct is. So, wouldn't that have mattered to see how they treated other people that did exactly the same thing as Papin? A couple of things, Your Honor. First, the issue of the meaning of that language, whether there was ambiguity in the contract, never came up at trial. There was never a request for a jury instruction on that. That was never an issue that was brought up in response to our motion for judgment as a matter of law. That's an issue that we have seen on appeal only. The district court's holding when Judge Johnson talked about the other resident evidence was strictly based around the fact that it was being offered for purposes of comparator evidence along the same vein as you would see in a Title VII discrimination case. And counsel mentioned a minute ago, part of the purpose of that is that you could show pretext. You could show that the reasons weren't true, but this is not a discrimination case. That is the mechanism of proof in most circumstantial Title VII cases because you can't climb in somebody's head if there's not direct evidence of discrimination. You have to see how they compared to other people who were similarly situated. The question here was whether- Well, I'm well aware of that, but it would seem a little odd if he did X, Y, Z, and then that's why you fired him, but everybody else in the room also did X, Y, Z, and you didn't fire them. Wouldn't that be something the jury would want to know and it would have perhaps come out the other way on that contract? Well, whether or not it would have come out the other way, I don't know, Your Honor, but the authority that we cited- Oh, I do. I mean, I don't know, of course, but it would have made a difference and it certainly would have been something discussed. They crossed out yes for no and they asked questions about it, so it doesn't seem like they immediately go, ah, that contract hasn't been violated, let's just look at the remediation. Why wouldn't that evidence have mattered and properly have been admitted rather than improperly not admitted? I mean, why is that not in evidence that should have been allowed? Well, Your Honor, I think the authority that we cited in support of that argument, which again, didn't include this argument from Dr. Pappin's counsel at the time about what the meaning of the contract was, was that the question is not what has happened in other breaches of contract. The question is not even whether the institution has made a mistake in prior cases. The question is whether the contract in this particular case has been breached. Those were the authorities that were cited and that was the holding here. It's not that the comparison that counsel has made in their briefs to this court is relying strictly on the Reeves opinion and the Sanderson Court opinion does not hold that it's a general principle of evidentiary law that you compare employees to each other in all circumstances. Now, and I understand that, but this is a pretty big deal what y'all did or your client did and I respect the situation, of course, but what I'm trying to understand is what is it that Pappin did that was so different from everybody else that appropriately allowed them to essentially fire him? What was the conduct that Dr. Pappin was terminated for? Okay, what's your best argument on that? I'm sorry, I'm trying to make sure I'm answering the question. Yeah, I mean, if that's how you want to answer the question, what's your best argument on that? What Dr. Earle specifically told Dr. Pappin when he testified at trial was there had been a continuing pattern of professionalism issues starting from the very first month that Dr. Pappin started his residency. From his very first rotation in the cardiovascular ICU, he was unable to get along with the professional staff there. He got into an altercation with a nurse practitioner. He was, there were comments on his evaluations as he went through different rotations. And where in the contract does it say you have to get along with everyone? I'm sorry, Your Honor, there's not language in the, and you mean the house officer contract? Yeah, well there's, you said that's the only contract, so. That is the only contract. Okay, so? Well, the contract says that it can be terminated for inefficiency, malfeasance, or contumacious conduct, Your Honor. Okay, but the problem is sometimes people just don't like you and you, I mean, I don't know why that should make a difference as to whether you can ultimately become a doctor. I've been in front of doctors who weren't really all that friendly, but did an amazingly good job, and that's really what matters to me. Well, Your Honor, in this case, what the record showed is there had been a continuing pattern where Dr. Earle went to Dr. Pappin over and over after receiving complaints from attending physicians from more senior residents that he wasn't performing tasks that he had been assigned to, and ultimately, as you can see in the written remediation plan, there was a concern that was presented by a more senior resident that she had instructed him to perform certain tasks over a period of time with a patient who was hospitalized for a long time, and he had not done that. That's what the senior resident reported. And so, yes, when the matter ultimately gets referred to the HR department and goes through that process as a professionalism misconduct matter, they were looking at the language of the house officer contract that said, is there malfeasance, is there inefficiency, is there contumacious conduct here? And the record that Dr. Earle had been gathering over those months said not only did that exist in one incident, although that one incident was the tipping point for what happened, there had been a growing record of that from the very first weeks that he was in the hospital. That's the ulcer incident? The last, the last straw incident, yes, sir. Yeah, if you, if we could turn to, because my focus has been on the remediation agreement, and you, of course, Dr. Earle, once there's a notice of deficiency of some sort, Dr. Earle properly began a remediation. Maybe could have moved to probation, suspension, I don't know what the sequence is. But here, it seems what the jury was concerned about was that there was an immediate, firing him wasn't last resort. Firing is sort of first resort. And I guess that's the flavor of the case, that he gets told he gets 60 more days, then he shows up the next day and he's fired. And it's the integration of the remediation agreement with the employment contract. Do you want to speak to that? Yes, sir, your honor. The fact that both of those were presented as separate, stand-alone potential contracts to the jury does make this case a little bit unusual. The testimony from Dr. Earle was that his impression at the time he wrote up the remediation plan was that that was a necessary step, that he could not move further with taking any action against Dr. Pappin unless and until he had written that up. After he wrote it up, he went and talked to Dr. Rick Barr, who was the director of all the GMA programs at the medical center at that time. And Dr. Barr said, you've just told me you've got a patient safety issue. That's not something that we need to remediate. We can move immediately on that because it's not an academic issue. That's a personnel issue that needs to be addressed promptly. So that was the sequence of events. I think it's fair to say that that was on the jury's mind since both of those issues were presented. But coming back to the questions you were asking a few minutes ago, your honor, none of that matters because the remediation plan was never a contract. It couldn't have been a contract. For that to have been a contract, the premise that the court has to accept is that Dr. Earle had been documenting a pattern of issues, a pattern of behaviors that culminated in this very serious patient care issue. And that after he had documented those and written them all down and told Dr. Pappin, I have serious concerns about your truthfulness, that's what it says in the remediation plan, the reward to Dr. Pappin was a clean slate and an additional 60 days in which nothing was going to happen to him. That's an absurd result here. And that's leaving aside the point that Dr. Earle absolutely had no signatory authority on behalf of the medical center. He testified that he didn't have it. He testified that Dr. Woodward hadn't given it to him. He did not sign the house officer pamphlet. What about opposing counsel's argument that the handbook explicitly says the vice chancellor could delegate it? The handbook absolutely says that, but the handbook does not delegate authority of contracting to program directors. There is language that talks about program directors being responsible for residents. That's the job of a program director. It does not say they can modify their employment contract. It doesn't say that they can enter into contracts on behalf of the medical center. And none of the evidence that counsel points to in their briefing, whether it be the ACGME guidelines, the conversation that Dr. Earle had with Dr. Barr, none of those things constitutes what IHL policy specifically calls for, which is a written delegation of authority from the institutional executive officer to anybody else who's going to execute a contract. The handbook lays that out very clearly, too. Nobody but the chancellor of the university or the vice chancellor for health affairs holds that authority, and it has to be delegated. IHL policy says it has to be delegated in writing, but there's no authority that anybody ever intended to delegate that authority. Then why was that given to a jury? Your Honor. We get so many cases where everybody's saying, as you've heard in the last one, this needs to go to a jury. Well, why did this one not go to a jury? Why did this one go to a jury instead of not going? Your Honor, it went to the jury over us kicking and screaming about it, because we were making these same arguments for judgment as a matter of law on this contract after the case in chief, after Dr. Pappin rested his case, after the close of all proof. We made these arguments and said that there is one contract, and if the jury is going to consider it, they need to be instructed that the house officer contract is a contract. Now, when it was sent to the jury, the district court sent an instruction. Nobody disagreed that the house officer contract was a contract, so the jury was just asked, did the medical center breach this contract? For the remediation plan, the jury was asked to find whether a contract existed first, and if so, did the medical center breach it when it terminated Dr. Pappin's employment? The problem with that, number one, we had already argued to the district court that there was no evidence in the record on which a reasonable jury could rely to find either that there was capacity for Dr. Earle to enter into that contract on behalf of the medical center, or that there was separate consideration to be able to make it a new contract. And the jury wasn't instructed about that authority or capacity. At trial, do you recall, were you arguing it was bylaw 707 or 801, or is that a distinction without a difference? My recollection, Your Honor, is that we were focusing on IHL bylaw 707, and that the district court, when they were looking through the bylaws, also said that the 800 could apply because it relates to employment policies. The district court ultimately reached the right conclusion on that and said, at the end of the day, it's an academic question, it doesn't matter if 707, it doesn't matter if 801 apply, because even if you assume that 707, which requires the delegation from the vice chancellor to be able to sign agreements, is not the applicable bylaw, but the 800 level is, that requires the approval of the associate dean for graduate medical education, which again makes sense because the associate dean for GME signed the house officer contract to start with. So it doesn't matter which bylaw you're looking at. The appropriate person with authority never delegated any of it to Dr. Merrill. I mean, one of the problems to me, though, is that because both of them were before the jury, the jury did seem to be having some trouble with the house contract, they went back and forth, they asked questions, but because they had the remediation, they apparently all were able to agree on that, they ended up doing what they did. It's a little bit like whether you're going to ask the jury about murder and manslaughter, or just murder versus no murder, because that can make a difference in how the jury maybe ends up agreeing on something. I don't know that that is dispositive here, but it is kind of relevant as to why the judge gave it to the jury and whether we should just order a new trial, given all of the problems and issues here. Your Honor, I think it's certainly reasonable to conclude that, you know, it was an unusual situation the way the jury was instructed. That's certainly the case. But the house officer contract was presented as is, and it was undisputed that that was a contract, that it was binding on the medical center, that it was enforceable. That's where the four cause termination language came from. And so that issue was very clearly put before the jury, and they did not find a breach of the house officer contract. So to the extent that there was confusion about what the remediation agreement meant and what damages might flow from that, the house officer contract issue, the issue about whether the university or the medical center breached the only contract it had, was resolved by the jury. All right, but only in connection with. So I mean that, it's an issue. Let me turn to the punitive damage question I had, because on page 29 of your red brief, it says that even if we put aside the issue of the state, punitive damages may only be awarded in a breach of contract when the breach is such and such, such and such, as to constitute an independent tort. So you're saying the contract alone is not enough. It has to be a tort to give punitive damages, regardless of whether it's a state. Your opponent said you didn't make that argument, but that is what I'm reading. Am I not reading it correctly? No, Your Honor. Under Mississippi law, you're correct. Under Mississippi law. A breach of contract by itself, I owe you $100, and I don't pay it. That's not enough for you to get punitives. That's correct. There has to be. Even if it's obvious, I was supposed to pay it today, and I never did, or I was supposed to pay it yesterday, and I did not, I could certainly lose the $100, but you couldn't also get $100 million for punitives. You can intentionally breach a contract all day long, and it not rise to the level of a tort, such that punitive damages, or the people intend to make the business decision to breach contracts all the time, and there may be remedies that flow from that. The party who suffered the breach needs to be put back in the same position that they were in prior to the breach, but that doesn't mean that punitive damages are awarded. And that's true, regardless of whether we're talking about a state. Like even if we were just talking about Katharina and Steve. That's correct, Your Honor. That's separate, in part, from the sovereign immunity issue. Now, it gets complicated, because of the sovereign immunity issue. Yeah, I get that. But I was just trying to make sure that I didn't misunderstand you, because it seemed to me you made that argument. Well, and I think the district court also got this correctly. It's not entirely straightforward, because you have to kind of patch together several different authorities. I'm not sure our Mississippi Supreme Court has been 100% clear. They just haven't had the opportunity to directly speak on this. But if you bring a claim for breach of an express contract, and you are also making a claim for punitive damages based only on that claim, a claim for breach of an express contract, that's a claim for tortious breach of contract. That's what the tort is. When the case law says you must show such ill acts that rise to the level of an independent tort, the court uses the exact same language to describe what a tortious breach of contract is. So the request for that type of damages takes it out of the realm of a normal breach of contract, and it provides a tort remedy, because what you're talking about is tortious conduct. And, Your Honors, I see my time is starting to run out. I've touched briefly on the fact that Dr. Earle didn't have any authority, and we've There is absolutely nothing in the record that says that he has the authority. The ACGME guidelines don't say that. There are 40 plus pages of ACGME guidelines. There are a lot of musts. There are a lot of shalls. There's nothing about remediation agreements for residents, much less anything that says that remediation agreements, program directors must have the authority to bind the institutions to them. Their experts did not testify that Dr. Earle had authority to bind the medical center to a contract. The assumption here is that if there is something called a remediation agreement, it must necessarily be a binding contract. But that's just not the case, Your Honor. Performance plans, like the district court recognized that this was, occur all the time. They can be signed. They can be unsigned. They can be verbal. They cannot. This piece of paper did not create a binding agreement, because at the time Dr. Pappin signed it, he was already employed. He didn't need another agreement for 60 more days of employment. I just want to, since you only have a minute left, do you want to cover anything about actual damages? If we were to end up agreeing that the remediation contract was a contract, do you have anything to say about actual damages? This is the lost income damages? Whatever you want to say on it. I'm just asking if you have something to say on actual, because we already talked about punitive. Yes, Your Honor. Just very briefly, the district court did not hold that consequential damages were never available in a breach of contract action. It held that when a contract provides for a certain term of performance, the actual economic damages that flow from that contract are limited to the term of that contract. If there's a one-year employment contract, the actual economic damages for that contract are going to be the salary that was unpaid for that contract. That's the $14,000 or so in this case. The Harrison case that the district court cited actually recognized that there were categories of consequential damages that could be awarded. It's just not actual economic damages, and that was the district court's holding in this case. Okay. Thank you, Your Honor. Thank you. We'll now hear the rebuttal. On the question of liability and the remediation agreement, I'd like to emphasize three things. Number one is the expert evidence. We highlighted this in our reply brief. There was an expert who studied all of the facts about this case, knows all about how have authority to enter into remediation agreements with residents. Did he make any distinction between private hospitals and state-run hospitals? Your Honor, the expert applied his analysis to this particular hospital because there isn't a distinction in that respect. They all follow the same structural guidelines. There really is a structure to the hospitals. That expert evidence was not objected to, and it's clearly in the record. So that backs up what Dr. Earle said as well. But his argument, no one's contesting that the program director that hires the medical residents, supervises them, should put them appropriately, did, on an academic performance plan. Full authority to remediate. Their argument is very different. Their argument, there's nothing in the record that suggests he had authority to bind the university. Their argument really is that he didn't have an authority to make an unwise agreement. This is like district courts having jurisdiction to make errors. He had jurisdiction. He had authority to make this kind of agreement, to make a remediation agreement. He made one they don't like because it set the standards, and then he immediately busted it. But this area was an area in which he could make an agreement, just like a court has jurisdiction, even if it does so erroneously. So let's say a medical resident is working and has difficulties, and they put them on a performance plan that says, you know, speak nicely to the nurses and all that. And you've got 60 days to do that. But on day 10, there's a patient safety issue. It would be a breach of contract to say, you can't work around patients. No, Your Honor, because the terms of this remediation, that's baked into this agreement. It says, you get 60 days. You have to elevate your performance, and we will not terminate you unless there's a safety issue. There's a proviso in here for that exact scenario. This was a well-thought-out agreement. There are numbers. It said, you have to raise your performance, and we won't fire you for 60 days unless it's an actual safety issue. This was a well-thoughtfully crafted agreement. It spells out- Well, I mean, does it say what you just said? We won't fire you? Yes. So 6-6-4-2 says, is the seriously threatens patient safety. That's the proviso. Right. But does it say, you won't be terminated? I mean, the agreement says, you have 60 days from today to show improvement. And that's why question one in the charge was, is this an agreement? Is this really consideration on both sides that are side one? There was a question in the first part of the argument about lost income and how long this might last. I want to emphasize one citation that shows you this particular plaintiff would have lasted beyond one year. That evidence is at 4-4-3-2. At 4-4-3-2, the witnesses say, would Dr. Pappin have lasted beyond one year but for this firing? They say, absolutely yes. The last thing I want to talk about is punitive damages. There's something of a semantic debate going on between the parties. The question presented is, can a plaintiff who sues for breach of contract recover punitive damages? And what matters is the difference between what you prove and how you prove it. Right. What we're proving here is a breach of contract action. There's an agreement. They breached it. We suffered damages. How did they breach? An ingredient of that has a particularity to it. You have to show that they breached the contract in one of a few ways. Show that they breached by doing conduct that would constitute gross negligence. You're still asserting a contract claim, but this is how you're getting over the punitive trigger. Show that they breached the contract by committing conduct that would be gross negligence. Or show that they breached the contract with malice. But what they quote is intended by intentional wrong, insult, abuse, or such gross negligence as to constitute an independent tort. That's that Ingleberg that they cite. So then the independent tort brings you back to this whole state punitive damage issue. We divide that list up differently. They think that A, B, and C, that all constitute an independent tort. We think malice, standalone, is a trigger for punitive damages. And that's what the Supreme Court said. Or gross negligence, that would constitute a tort, gets you over the line. Or fraud, that constitutes a tort. But the state of mind trigger, the malice, that wrongful conduct, is a standalone trigger under Mississippi law. If the court has no more questions, time is up. Okay. Thank you so much. The case is now under submission. And we're going